Nathaniel J. DIGSBY, Appellant,

v.

UNITED STATES, Appellee.

No. 06–CF–1585.

District of Columbia Court of Appeals.

Argued Feb. 5, 2009.
Decided Oct. 1, 2009.

**600**

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Samia Fam, were on the brief, for appellant.

Erin Walsh, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Assistant United States Attorney, Florence Pan, Assistant United States Attorney at the time the brief was filed, David S. Johnson, and Perham Gorji, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and BELSON, Senior Judge.

REID, Associate Judge:

A jury found appellant, Nathaniel J. Digsby, guilty of unlawful possession with intent to distribute a controlled substance (heroin) and unlawful possession with intent to distribute a controlled substance (marijuana),[1] both in violation of D.C.Code § 48–904.01(a)(1) (2001); and unlawful possession of drug paraphernalia, in violation of § 48–1103(a).[2] Mr. Digsby contends that his conviction must be reversed because the trial court violated his constitutional Sixth Amendment confrontation right by ruling, over his objection, that a Drug Enforcement Administration report, the "DEA–7," prepared by a DEA chemist, would be admitted into evidence without the testimony of the chemist. The government agrees, but argues that the error in allowing the DEA–7 into evidence without testimony from the chemist was harmless beyond a reasonable doubt, and that even if this court concludes that the convictions for possession with intent to distribute heroin and marijuana ("PWID") must be reversed, it should remand the case "for entry of judgment on the lesser-included offenses of attempted PWID heroin and attempted PWID marijuana." We affirm the trial court's judgment of conviction on the marijuana charge, but we reverse the trial court's judgment of convic-

1. Count 1 of the indictment stated:
   On or about August 3, 2005, within the District of Columbia, Nathaniel J. Digsby and [his wife] did unlawfully, knowingly and intentionally possess with intent to distribute a quantity of heroin, that is, heroin, a schedule II controlled substance. (Unlawful Possession With Intent to Distribute a Controlled Substance, in violation of 48 D.C.Code, Section 904.01(a)(1) (2001 ed.)). Count 2 of the indictment specified:
   On or about August 3, 2005, within the District of Columbia, Nathaniel J. Digsby and [his wife] did unlawfully, knowingly, and intentionally possess with intent to distribute a quantity of cannabis, that is, marijuana, a schedule III controlled substance. (Unlawful Possession With Intent To Distribute a Controlled Substance, in violation of 48 D.C.Code, Section 904.01(a)(1) (2001 ed.)).

2. The trial court sentenced Mr. Digsby on the heroin conviction to sixteen months of incarceration followed by three years of supervised release; on the marijuana conviction to 180 days of incarceration, to run concurrently; and on the drug paraphernalia conviction to thirty days of incarceration, also to run concurrently. The jury acquitted Mr. Digsby's wife, who was indicted with him, of all charges. Mr. Digsby does not challenge his drug paraphernalia conviction and we see no reason to disturb it.

tion on the heroin charge and remand the case for a new trial on the heroin count.

## FACTUAL SUMMARY

A grand jury charged Mr. Digsby with two specific crimes that are at issue in this case: (1) "unlawfully, knowingly, and intentionally possess[ing] with intent to distribute a quantity of heroin, that is, heroin, a schedule II controlled substance"; and (2) "unlawfully, knowingly, and intentionally possess[ing] with intent to distribute a quantity of cannabis, that is, marijuana, a schedule III controlled substance." At Mr. Digsby's trial on these charges, the government presented evidence showing that on August 3, 2005, at approximately 6:30 a.m., several police officers, including Officers Andrew Keness, Peter Ward, and Jonathan Hofflinger of the United States Park Police, participated in the execution of a search warrant in the 1200 block of Half Street, in the Southwest quadrant of the District of Columbia. After Officers Keness and Hofflinger knocked on the door and announced that they had a warrant, they watched as Mr. Digsby looked out of a second floor window and then turned away.[3] Officer Keness identified the window as being in the front bedroom. After the officers forced their way into the home, Officer Keness saw Mr. Digsby on the second floor in front of the bathroom. Mr. Digsby's wife was in the rear bedroom with two young children, and the teenage son was sleeping on the first floor.

Officer Ward testified that he collected evidence from the kitchen counter, the dining area, and the front upstairs bedroom. He identified government exhibits which contained items seized from Mr. Digsby's residence. Specifically, he recovered: (1) from the kitchen counter, thirteen small yellow plastic bags (each containing a beige powdery substance) inside a clear plastic bag with a red and green logo;[4] (2) "a bag containing a green leafy substance that was adjacent to the thirteen yellow bags on the kitchen counter in open view";[5] (3) from a kitchen drawer underneath the counter, a number of empty small red plastic bags; (4) from the dining room, a digital scale and a plastic bag containing numerous empty small ziploc bags;[6] (5) from the upstairs bathroom toilet bowl, sixty-four small packaged bags of marijuana;[7] (6) from the second floor front bedroom with the window, twelve yellow plastic bags containing a beige powder substance wrapped in a white plastic bag in a plastic bowl;[8] (7) a plastic bag with an apple logo containing empty green ziploc bags from the night stand drawer in the second floor front bedroom; (8) $110 and $73 in cash from a pair of men's shorts and $160 in cash from a pair of lady's pants from the floor of the second floor front bedroom; (9) photographs, including those of Mr. Digsby and his wife from the second floor front bedroom closet; and (10) from the second floor front bedroom mail matter addressed either to Mr. Digs-

---

3. Officer Hofflinger also noticed Mr. Digsby at a front window.

4. Officer Ward identified Exhibit 10 as the DEA lab report for the substance in the thirteen yellow plastic bags.

5. Officer Ward identified Exhibit 11 as the DEA report for the green leafy substance.

6. Officer Ward identified Exhibit 15 as a picture of the scale and the table on which the

scale rested, and Exhibit 16 as a photograph of the ziploc bags.

7. Officer Ward identified Exhibit 18 as the DEA lab report for the bags from the toilet bowl, and Exhibit 19 as a picture of the toilet from which the bags were recovered.

8. Officer Ward identified Exhibit 21 as the DEA report for the twelve bags recovered from the bedroom dresser, and Exhibit 22 as a picture of the plastic bowl.

by or his wife at the Half Street location.[9]

Officer Ward testified that he field tested the beige powdery substance in the thirteen bags taken from the kitchen counter and the test "indicated it was heroin." When shown Government Exhibit 7, which contained the green leafy substance, also found on the kitchen counter, Officer Ward did not mention a field test and did not identify the substance except to say that it was "a green leafy substance." He referred to the sixty-four bags recovered from the toilet bowl as "marijuana," but he did not mention a field test. Nor did he say that a field test was done on the twelve bags of beige powder that were found in the second floor front bedroom.

The prosecutor used the DEA reports in its direct examination of Officer Ward. For example, the prosecutor referred to Government Exhibit 10, "the lab report for the 13 yellow zips of heroin," and asked Officer Ward, "what does the DEA say the substance was in those yellow zips?" The officer replied, "The active drug ingredient in that substance was heroin hydrochloride and cocaine." The prosecutor inquired, referencing "Government Exhibit 11, which is the DEA lab report for the bag of the green leafy substance, Government's Exhibit 7, 'what does the DEA say that leafy substance was?'" Officer Ward answered: "The active drug ingredient established or common name was marijuana." [10]

During his testimony, Officer Hofflinger stated that after Mr. Digsby and his wife had been arrested and transported to a police station, Mr. Digsby asked him why his wife had been arrested. When Officer Hofflinger indicated that the reason for the wife's arrest was the recovery of drugs from the house, Mr. Digsby said "it was only some weed and some dope [,] . . . only 14 bags of dope or so, . . . and just put it all on me. Put it all on me." In response to the prosecutor's question, "[d]id he say it was his drugs[,]" the officer replied, "[y]es, he said it was his." Based on his "training and experience" Officer Hofflinger declared, " 'weed' is marijuana" and " '[d]ope' is heroin."

Although the government did not present the testimony of a DEA chemist, the trial court admitted the DEA reports.[11] The government called a drug expert, Detective Wayne Knox, who testified about the packaging of drugs and relied on the DEA reports introduced by the government. Detective Knox referenced the findings of the reports, and asserted that the ziploc bags retrieved from the Half Street house were used to package heroin and marijuana and the amount of drugs found on the premises was consistent with an intent to distribute drugs rather than personal use; the digital scale measured drugs; tally sheets like those found in the house were used to keep a record of drug sales and money owed by the purchasers; and that it is common for drug dealers who are on the premises at the time of a search to put the drugs in the toilet.

---

**9.** All of the government's exhibits were admitted into evidence.

**10.** The prosecutor also asked Officer Ward about the DEA exhibits relating to the bags removed from the toilet bowl and the front second floor bedroom.

**11.** The DEA reports revealed that the substance in the thirteen yellow plastic bags taken from the kitchen consisted of 3.8 grams of a mixture of heroin and cocaine; the plastic bag with the green leafy substance, recovered from the kitchen, contained 2.8 grams of marijuana, the sixty-four ziploc bags found in the toilet bowl had 88.9 grams of marijuana, and the twelve ziploc bags on the front second floor bedroom dresser had 3.7 grams of heroin.

Mr. Digby's defense was innocent presence, that is, he was present in the home but did not have constructive possession of, nor the intent to distribute the heroin or the marijuana because these drugs belonged to someone else. Mr. Digsby's mother, the only witness for the defense, testified that her deceased daughter's husband, Edward Fields, who had previously been convicted on a drug offense, often stayed at the Half Street home, but she acknowledged that she did not see him there on the day the police executed the search warrant.

The trial judge instructed the jury on both of the drug counts of the indictment—possession with intent to distribute heroin and possession with intent to distribute marijuana, as well as the lesser-included offenses of possession of heroin and possession of marijuana, but the court did not instruct the jury on attempted possession of heroin or marijuana, or attempted possession of an unidentified controlled substance. The jury verdict form posed two major questions: (1) "How do you find the defendant Nathaniel Digsby on the charge of Possession with Intent to Distribute Heroin?" and (2) "How do you find the defendant Nathaniel Digsby on the charge of Possession with Intent to Distribute Marijuana?" The jury replied "Guilty" as to both questions.

## ANALYSIS

Mr. Digsby contends that "[t]he admission of the DEA–7 chemist's report in the government's case-in-chief over defense objection violated his Sixth Amendment right to confront witnesses against him." He maintains that "[b]ecause—at the very least—there is a 'reasonable possibility' that the DEA–7s 'might have contributed' to his convictions, reversal is required." The government agrees that the trial court erred by admitting the DEA chemist's reports without the testimony of the DEA chemist, but argues that reversal of the convictions is not warranted because "the erroneous admission of the DEA–7 reports was harmless beyond a reasonable doubt."

The government further asserts that even if this court concludes that reversal is required, judgment could be entered on "the implicit lesser included offenses of attempted possession of heroin and marijuana with intent to distribute them," or "the lesser included offenses of generic possession with intent to distribute a controlled substance or attempted possession with intent to distribute a controlled substance," because the error was harmless as to them. In reply to the government's arguments, Mr. Digsby insists that the government cannot satisfy its burden to show harmlessness beyond a reasonable doubt, that "[t]he government's burden ... is not just to point to other circumstantial evidence in the case suggesting drug dealing generally ... [,] but to demonstrate that 'there is n[o] reasonable *possibility* that the evidence complained of *might* have contributed to the verdict obtained.'" Mr. Digsby maintains that even with respect to attempted possession with intent to distribute heroin and marijuana, "the DEA–7s ... served as the most powerful proof that the substances were in fact heroin and marijuana," and they "were also the most compelling proof of the defendant's intent to possess these substances." Furthermore, Mr. Digsby contends that entry of judgment on the lesser included offense of possession or attempted possession with intent to distribute a controlled substance would violate his "Fifth Amendment right to be indicted by a grand jury of the crime for which he is to be tried," as well as his right to a jury trial because the trial court did not instruct the jury concerning "possession with intent to distribute any controlled substance," and

there is no statutory penalty for attempted possession with intent to distribute any controlled substance.

■ We have said previously that "[w]here a conviction is based upon the admission of evidence in violation of a defendant's Sixth Amendment right to confrontation, it is reversible unless the error is 'harmless beyond a reasonable doubt.'" *Williams v. United States,* 858 A.2d 978, 981 (D.C.2004) (citing *Lilly v. Virginia,* 527 U.S. 116, 140, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999)) (quoting *Chapman [v. California,]* 386 U.S. [18,] 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). "This standard requires that the government show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. 824). "Accordingly, where there is a 'reasonable possibility that' [the erroneously admitted DEA reports] 'contributed to [Mr. Digsby's] convictions,' we must reverse." *Id.* (citations omitted).

■ The government correctly concedes that the trial court erred by admitting the DEA chemist's lab reports without the testimony of the DEA chemist. As we have recognized in our prior decisions, including *Duvall v. United States,* 975 A.2d 839 (D.C.2009),12[12] DEA reports

which analyze drugs are "testimonial" under *Crawford v. Washington.*[13] *See also Melendez–Diaz v. Massachusetts,* concluding that forensic affidavits or the results of forensic analysis are testimonial and that "[t]he Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits."[14] Hence, as in *Duvall, supra,* the standard of review in this preserved error case is constitutional harmless error.[15] Under that standard, the government "bears the burden of demonstrating that the constitutional error was 'harmless beyond a reasonable doubt,' meaning that the verdict was 'surely unattributable' to the erroneously admitted evidence."[16] Ultimately, we must determine "whether there was a reasonable possibility that the admission of the DEA laboratory report contributed to [Mr. Digsby's] conviction."[17] Mr. Digsby was convicted of unlawful possession with intent to distribute a controlled substance (heroin and marijuana), and unlawful possession of drug paraphernalia.

■ To establish that Mr. Digsby was guilty beyond a reasonable doubt of possession of a controlled substance (heroin and marijuana) with intent to distribute, the government had to show that he "knowingly and intentionally possessed a controlled substance with the specific intent to distribute it."[18] "An intent to dis-

---

12. *Duvall, supra,* at 842 (quoting *Fields v. United States,* 952 A.2d 859, 861 (D.C.2008)) (citing *Howard v. United States,* 929 A.2d 839, 841 (D.C.2007) and *Thomas v. United States,* 914 A.2d 1, 5, 19 (2006)).

13. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

14. —— U.S. ——, ——, 129 S.Ct. 2527, 2542, 174 L.Ed.2d 314 (2009),.

15. *Duvall, supra,* at 843 (citing *Callaham v. United States,* 937 A.2d 141, 146 (D.C.2007)).

16. *Id.* at 843 (citing *Fields, supra,* 952 A.2d at 866) (quoting *Sullivan v. Louisiana,* 508 U.S.

275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)) (internal quotation marks omitted).

17. *Id.* at 843; *see also Callaham, supra,* 937 A.2d at 147 (concluding that "given the lack of evidence apart from the chemist's report that the white-rock substance recovered from [appellant] contained cocaine, it is apparent that there is at the very least a 'reasonable possibility' that the admission of the report contributed to [appellant's] conviction").

18. *Taylor v. United States,* 662 A.2d 1368, 1371 (D.C.1995); *see also Boddie v. United States,* 865 A.2d 544, 547 (D.C.2005).

tribute can be inferred from expert testimony and the possession of a quantity of drugs that exceeds a reasonable supply." [19] The government must demonstrate by direct or circumstantial evidence that the controlled substance consisted of a measurable amount.[20]

The government's evidence in the case before us is much stronger than in *Duvall* with respect to the issue of constitutional harmless error. In *Duvall*, we reversed appellant's conviction for possession of a controlled substance because we could not "conclude that the error [of admitting the DEA chemist's report without the testimony of the lab analyst] was harmless beyond a reasonable doubt." [21] There, the government advanced five factors to support its contention that "there was no reasonable possibility that the erroneous admission of the lab report contributed to [appellant's] conviction":

> (i) [The arresting officer, the government's sole witness] received specialized training in identifying the smell of marijuana, (ii) he detected the odor of marijuana emanating from [appellant's] vehicle, (iii)[he] recovered a "green weed substance" from the vehicle, (iv) the substance field-tested positive for THC (the active ingredient in marijuana), and (v) [appellant] admitted at trial that the substance recovered from the car was marijuana.

Here, the government posits six factors which, it asserts, shows "overwhelming, additional proof" of Mr. Digsby guilt:

> (i) appellant admitted he possessed "weed" and "dope," terms an experienced police officer described as referring to marijuana and heroin respectively, (ii) the jury heard testimony from an

experienced police officer, without objection, describing the green weed substance as marijuana, (iii) [officer's] testimony that some of the beige powder field-tested positive for heroin, (iv) the police recovered numerous items associated with drug dealing, including ziplocs, a digital scale, tally sheets, and a large quantity of cash, (v) evidence of appellant's consciousness of guilt, as reflected ·by his flight from the window upon seeing the police, and his presence near the bathroom in which marijuana was found floating in the toilet, [in addition to] [the government] expert's testimony that drug dealers often attempt to flush their drug when the police arrive to execute a search warrant, and (vi) the nature of the substances at issue was so obvious that even appellant's counsel took that fact for granted during the trial ... [and] expressly conceded that the substances were marijuana and heroin....

With *Fields, supra,* and *Callaham, supra,* as our guide, both of which resulted in reversals under the constitutional harmless error standard, we examined the government's factors in *Duvall,* several of which are similar to those the government puts forward in the instant case. What we said about the field test, the green weed substance, appellant's alleged admission, and the historical prominent and central role DEA reports have played in drug convictions, is instructive here.

■ While we recognized that a field test "does constitute evidence" of the identity of the seized substance, and "we consider it in determining whether the evidence against [appellant] was overwhelming," nevertheless a field test "is

---

19. *Id.* (citations omitted).

20. *Thomas v. United States,* 650 A.2d 183, 197 (D.C.1994) (en banc).

21. *Duvall, supra,* at 841.

not dispositive." [22] We recalled that appellant's conviction in *Callaham* was reversed "notwithstanding evidence of a positive field test for cocaine, because 'a positive field test, standing alone, [cannot] prove beyond a reasonable doubt that the substance was cocaine.'" [23] We also emphasized that a law enforcement officer's reference to "a green weed substance" might not be "dispositive" since we reversed the convictions in *Fields* and *Callaham*, respectively, despite the existence of testimony connecting the appellant to a "green weed substance" and a "white-rock substance." [24] Furthermore, we determined that appellant's statement in *Duvall*, that "if there's any possibility of it [marijuana] being mine, it had to have been in there for months and months," did not constitute an admission since he "consistently denied knowledge of the marijuana prior to the search." [25] Significantly, we noted that "[appellant's] statements regarding the bag [of marijuana] are, in any event, relevant only to the element of possession and not to the element of whether the substance was a controlled substance." [26]

But, we highlighted another crucial historical consideration and factor in *Duvall*, the "prominent" and "central role" the DEA–7 or DEA chemist's laboratory reports "have played" ... in this jurisdiction generally and in [*Duvall*] in "particular"; we reiterated that "when the government charges a criminal defendant with possession of a controlled substance but fails to introduce a DEA laboratory report, a jury 'could well have ... a doubt about the government's case if the prosecution did not proffer the type of scientific evidence establishing the identity of the substance that is commonly expected.'" [27]

■ Based, in part, upon our prior analysis in *Duvall*, *Fields*, and *Callaham*, we conclude that there is "no reasonable possibility that the admission of the DEA laboratory report contributed to [Mr. Digsby's] conviction" on the charge of possession with intent to distribute a controlled substance (marijuana). [28] The government introduced ample, strong and compelling evidence that Mr. Digsby unlawfully possessed marijuana with an intent to distribute it. The jury heard and saw: (1) Officer Hofflinger's testimony that Mr. Digsby described some of the drugs seized from his home as "only some weed"; (2) Officer Hofflinger's testimony, based on his training and experience, that "'weed' is marijuana"; (3) testimony of Detective Knox that ziploc bags are used to package marijuana; (4) government exhibits containing a green weed or green leafy substance, specifically, a bag removed from the kitchen counter in Mr. Digsby's home, and sixty-four small packaged bags of the green substance recovered from the second floor toilet, both reflecting amounts of marijuana that could be measured; (5) a scale and numerous empty ziploc bags, consistent with distribution, found in Mr. Digsby's second floor front bedroom; and (6) a plastic bag containing empty green ziploc bags, as well as large sums of cash, both consistent with distribution of drugs, retrieved from Mr. Digsby's second floor front bedroom. Giv-

22. *Id.* at 845.

23. *Id.* at 843 (quoting *Callaham*, 937 A.2d at 147) (other citations omitted).

24. *Id.* at 843.

25. *Id.* at 848 and n. 10.

26. *Id.* at 848 n. 10.

27. *Id.* at 846 (citing D.C.Code § 48–905.06 (2001)); *Fields*, 952 A.2d at 864, 866, 867.

28. *Fields, supra,* 952 A.2d at 866.

en this extensive, strong and compelling evidence which the jury saw (including the multiple bags of green weed or leafy green substance commonly recognized as marijuana), we have no doubt that the government sustained its burden of proof as to the marijuana charge, and that the constitutional error of admitting the DEA chemist's laboratory report without the testimony of the chemist was " 'harmless beyond a reasonable doubt,' meaning that the verdict was 'surely unattributable' to the erroneously admitted evidence." [29]

■ We reach a different result with respect to Mr. Digsby's conviction on the charge of unlawful possession of heroin with intent to distribute. Although some of the same evidence mentioned above with respect to the marijuana charge, such as the scale, the ziploc bags, and the cash, represent independent, circumstantial evidence of Mr. Digsby's guilt on the heroin charge, we cannot conclude that the independent evidence is overwhelming. Officer Ward testified that he field-tested the beige powdery substance in the thirteen bags taken from the kitchen counter and the results showed the presence of heroin, but that test was not dispositive with respect to the required element of "measurable amount." And, Officer Ward did not mention any field test of the twelve bags of beige powder found in the second floor front bedroom. Thus, the jury reasonably would refer to the DEA laboratory reports pertaining to the bags containing the beige powdery substance. Those reports, introduced into evidence, confirmed the pres-

ence of 3.8 grams of a mixture of heroin and cocaine in the plastic bags taken from the kitchen, and 3.7 grams of heroin in the ziploc bags removed from Mr. Digsby's bedroom.

The DEA reports reasonably loomed even larger in the minds of the jurors when the prosecutor used them in the direct examination of Officer Ward. Referring to "the lab report for the 13 yellow zips of heroin," the prosecutor asked Officer Ward, "what does the DEA say the substance was in those yellow zips?" Officer Ward responded, "The active ingredient in that substance was heroin hydrochloride and cocaine." Because of the prominent use of the DEA reports in the proof of the heroin charge, we cannot say beyond a reasonable doubt that they did not contribute to the jury's verdict on the heroin charge. Moreover, we do not believe that Mr. Digsby's statement that some of the bags seized contained "some dope[,] ... only 14 bags of dope or so ....," and Officer Hofflinger's testimony that "dope" meant heroin could overcome the use of the DEA reports as proof of the heroin charge. "Dope" is a generic term that could signify other substances besides heroin, including cocaine or PCP, or indeed a mixture of substances such as that detected in the ziploc bags with the beige powdery substance that were taken from the kitchen of Mr. Digsby's home. In fact, the term "dope" has had a number of different meanings through the years, and now is often defined as "a narcotic" without any mention of "heroin." [30] As to the

29. *Duvall*, at 843 (citing *Fields, supra*, 952 A.2d at 866) (quoting *Sullivan, supra*, 508 U.S. at 279, 113 S.Ct. 2078) (internal quotation marks omitted).

30. Dope was borrowed into English from the Dutch word *doop*, "sauce." Throughout the 19th century it meant "gravy." In the North Midland United States, particularly Ohio,

dope is still heard as the term for an ice-cream topping, such as syrup. In the South, particularly in South Carolina, *dope* means "a cola-flavored soft drink." *Dope* was especially used of those medicinal preparations that produced a stupefying effect, and it even became a slang term for the dark, molasses-like form of opium that was smoked in opium dens. Some of the common modern mean-

heroin charge, we agree with Mr. Digsby that the DEA reports "served as the most powerful proof that the substance[ ][was] in fact heroin...." [31]

Having considered the evidence presented by the government, and our past decisions, including *Duvall*, we cannot affirm simply on the basis of a conclusion that the jury had enough evidence without the DEA reports to conclude beyond a reasonable doubt that a measurable amount of heroin was seized from appellant's home. Rather, we are constrained to hold that the government did not sustain its burden under the constitutional harmless error standard because there is "a reasonable possibility that the admission of the DEA laboratory report contributed to Mr. Digsby's conviction" on the charge of possession with intent to distribute heroin. [32]

We turn now to the government's argument that judgment could be entered on the implicit lesser included attempt offenses. We read the government's brief as arguing only that judgment could be entered on the offense of attempted possession of heroin with intent to distribute. At one point in its brief the government states: "At any rate, even if the [c]ourt were to conclude that reversal of appellant's PWID heroin ... conviction[ ] is warranted, the admission of the DEA–7 reports was harmless beyond a reasonable doubt with respect to the lesser-included offense[ ] of attempted PWID heroin ..., and this court may affirm on the lesser-included offense[ ]." Moreover, at the con-

clusion of its brief, the government asserts: "Accordingly, this [c]ourt can conclude beyond a reasonable doubt that, even if the DEA–7 reports had been excluded from evidence at appellant's trial, 'a rational jury would have found [appellant] guilty' of attempted possession with intent to distribute two distinct controlled substances." The words "two distinct controlled substances" undoubtedly refers to heroin and marijuana, the indicted offenses in this case. As we said in *Fields, supra:* "The government has not suggested [in its brief] that the information or evidence presented in this case would have supported a conviction of attempted possession of a controlled substance other than [heroin]." [33]

We are not persuaded that beyond a reasonable doubt the jury would have convicted Mr. Digsby of attempted possession of heroin with intent to distribute without a reference to the DEA reports. We already have concluded that those reports played a prominent and central role during the testimony of Officer Ward, a key government witness. Similarly, even though the jury could see the bags of yellow beige substance that were admitted into evidence, the DEA reports were the best evidence that those ziploc bags actually contained heroin. We believe it is inescapable that those reports would have influenced the jury in its consideration of whether Mr. Digsby attempted to possess heroin with intent to distribute, despite the strength of the government's circumstantial evidence. [34] Indeed, we concluded in

---

ings of the word *dope*—"a narcotic substance" and "narcotics" considered as a group,"—developed from this use of the word."

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE Fourth Edition, Updated in 2009, http://www.thefreedictionary.com/dope.

**31.** Given our conclusion, we do not consider Mr. Digsby's Fifth Amendment argument;

nor do we consider his contention regarding his right to a jury trial.

**32.** *Duvall, supra,* at 843; *see also Callaham,* 937 A.2d at 147.

**33.** *Fields,* 952 A.2d at 865 n. 12.

**34.** Some jurors may never have seen heroin before Mr. Digsby's trial and could not recog-

*Fields, supra,* that "the erroneous admission of the DEA–7 report without an opportunity to cross-examine the chemist who prepared it was not harmless beyond a reasonable doubt as to the offense of attempted possession of marijuana because we cannot say that the error did not contribute to the verdict, and the government did not otherwise present overwhelming evidence that appellant intended to possess marijuana."[35] While the government's circumstantial evidence in this case may well have been stronger than in *Fields,* we are not convinced that it was "overwhelming." Hence, entry of judgment on the offense of attempted possession of heroin with intent to distribute is unwarranted.

■ Even assuming, without deciding, that the government did not waive the argument that judgment could be entered on the putative lesser-included offense of attempted possession of an unidentified controlled substance with intent to distribute, as it suggested during oral argument, we are persuaded on this record that the erroneous admission of the DEA–7 evidence would not be harmless beyond a reasonable doubt. (It is unclear whether the statute, D.C.Code § 48–904.01(a)(1), permits the government to charge an offense without specifying the identity of the controlled substance in question. If not, then we have no lesser-included offense to consider. We need not decide that issue, however, for we reject the government's position even on the premise that offense exists.).

During oral argument, the government contended that if it only proved that Mr. Digsby thought he was possessing some controlled substance, it could convict him for possessing with intent to distribute a controlled substance, rather than the indicted offenses. However, the government could cite no cases in support of its contention. Mr. Digsby took issue with the government and cited two cases to support his position, *Wooley v. United States,* 697 A.2d 777 (D.C.1997) and *Robinson v. United States,* 697 A.2d 787 (D.C.1997). In both cases, we reversed convictions where the indictment charged distribution of heroin but the government constructively amended the indictment by proving distribution of cocaine.[36] We did not decide in *Wooley* whether "the indictment could properly have charged possession with intent to distribute a controlled substance, rather than specifying heroin or any other substance."[37]

*Wooley* emphasized the importance of the Constitution's indictment clause: "The Fifth Amendment guarantees the right of a criminal defendant to be tried for '[an] ... infamous crime,' only 'on a presentment or indictment of a grand jury.'"[38] *Robinson* focused on the danger of allowing a constructive amendment of the in-

---

nize it by sight. Moreover, jurors possibly would have noted from Officer Ward's testimony that the thirteen bags from the kitchen did not contain only heroin, and jurors reasonably would have recalled the DEA reports showing that the twelve ziploc bags recovered from the second floor front bedroom dresser contained pure heroin and those· from the kitchen counter a mixture of heroin and cocaine. Moreover, the jury may have focused on the word "dope" used by Mr. Digsby and, despite the testimony of an officer that "dope" meant "heroin," may have realized

that "dope" may denote other drugs, including cocaine and marijuana laced with PCP.

**35.** *Fields, supra,* 952 A.2d at 869.

**36.** *Wooley, supra,* 697 A.2d at 778; *Robinson, supra,* 697 A.2d at 788.

**37.** *Id.* (citations omitted).

**38.** *Wooley, supra,* 697 A.2d at 779 (quoting Amend. V of the Constitution; *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

dictment which enables the government to "rel[y] at trial on a complex of facts distinctly different from that which the grand jury set forth in the indictment, and which may deny the defendant notice of the core criminality to be proven at trial." [39]

■ Here, Mr. Digsby's indictment document gave him notice that the government had to prove beyond a reasonable doubt that he possessed heroin with intent to distribute it. Specifically, the government gave notice to Mr. Digsby that he would be required to defend himself against a charge of "possession with intent to distribute a quantity of heroin, ... a schedule II controlled substance." The government's suggestion that judgment be entered on the offense of possession of an unidentified controlled substance with intent to distribute it not only permits it to convict him on a complex of facts which are distinct from those set forth in the indictment but also undercuts the indictment clause by removing him from the protection of the grand jury and by failing to give him notice that he could be convicted of attempted possession of any controlled substance with intent to distribute it.[40] As the concurring judge phrased the problem in *Wooley:* "The analytical problem in this case arises because the indictment descended to particulars, and specified a particular factual way in which the crime had been committed, even if the grand jury could have charged in more general terms." [41] The same is true in Mr. Digsby's case. In light of *Wooley* and *Robinson,* and the indictment handed down in this case, and assuming no government waiver, we reject the government's suggestion that the

case be remanded for entry of judgment on the lesser-included offense of attempted possession of an unidentified controlled substance with intent to distribute; we are persuaded on this record that the erroneous admission of the DEA–7 evidence would not be harmless beyond a reasonable doubt with respect to this supposed lesser-included offense involving an unidentified controlled substance.

Consequently, we are constrained to conclude that there is a reasonable possibility that entry of judgment on a lesser-included offense of attempted possession of a controlled substance with intent to distribute would not be harmless beyond a reasonable doubt.

Accordingly, we affirm the trial court's judgment of conviction on the marijuana charge, but we reverse the trial court's judgment of conviction on the heroin charge and remand the case for a new trial on the heroin count.

*So ordered.*

---

**39.** *Robinson, supra,* 697 A.2d at 789–90 (citations and internal quotation marks omitted).

**40.** "A constructive amendment occurs when the trial court permits the jury to consider, under the indictment, an element of the

charge that differs from the specific words of the indictment." *O'Brien v. United States,* 962 A.2d 282, 320–21 (D.C.2008).

**41.** *Wooley, supra,* 697 A.2d at 787 n. 3 (Farrell, J., concurring).