**Derrick CARRINGTON, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

No. 11–CT–698.

District of Columbia Court of Appeals.

Argued Sept. 24, 2013.

Decided Oct. 17, 2013.

Jeffrey L. Light, Washington, DC, for appellant.

John J. Woykovsky, Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Rosalyn Calbert Groce, Deputy Solicitor General, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and NEWMAN, Senior Judge.

WASHINGTON, Chief Judge:

Appellant Derrick Carrington raises two issues on appeal from his conviction for driving under the influence of alcohol and/or drugs ("DUI"). The first of these issues is worthy of a published opinion given the frequency with which it has appeared before this court. Appellant's second argument is more easily disposed of summarily. For the reasons stated below, we affirm the trial court's judgment.

## I. Facts

Around 9:10 p.m. on April 16, 2008, Officers Benjamin Rubin ("Rubin") and Bai Bangura ("Bangura") of the Metropolitan Police Department ("MPD") responded to a report of a driver "slumped over the steering wheel of a gray or silver Chrysler Sebring." Officer Rubin spotted a car that matched the description and identified appellant as the man driving the car. Noticing that he was "driving very slow with little control," Officer Bangura came up behind him and turned on his emergency lights. Instead of stopping, appellant "rolled through a stop sign, and turned left into the oncoming traffic lane." Appellant then made a U-turn onto the other side of the road—into oncoming traffic—before "hitting the curb and coming to a stop."

When the officers approached his vehicle, appellant looked at them "with a blank stare, and was confused by [their] orders." While they "repeatedly advised him to put the car in park ... based upon his condition, he was unable to do so." Appellant was confused by the officers' order to exit the vehicle, and could not get out on his own. After he was helped out of the vehicle, appellant fell over and could not stand up. The officers testified that "[h]e was laughing the whole time, and ... without [their] assistance, he couldn't walk." Officer Rubin testified that there was no odor of alcohol coming from appellant's person or from the vehicle, but noticed that his speech was slurred, his pupils were dilated, and he was having difficulty following directions. Officer Bangura also did not smell any alcohol but stated that appellant was "glossy-eyed ... he just stared like he didn't understand what I was saying."

Officer Rubin then administered three standardized field sobriety tests ("SFSTs") to determine whether appellant was under the influence of drugs or alcohol. Appellant told Officer Rubin that he had no

physical issues that would interfere with testing, and never complained of any medical conditions. During each test, Officer Rubin observed indicators of intoxication. Based on the results of the SFSTs, Officer Rubin determined that appellant was under the influence of drugs or alcohol and arrested him.

Appellant was then transported to the police station, where Officer John Light conducted a breath alcohol test on him. Appellant scored a .000. Officer Light, who had been a police officer for 19 years, testified that when appellant arrived at the station to take the breathalyzer test, he was unsteady on his feet as if he were going to fall and was taking small steps and using his arms for balance. He also did not smell any alcohol and concluded that in his experience, if he was not drunk, appellant was under the influence of a drug or a narcotic, and that it "probably was PCP that he ha[d] taken."

While at the station, appellant also gave a urine sample. Officer Rubin collected the sealed cup with the sample, placed it in a labeled evidence bag, and delivered it to the Office of the Chief Medical Examiner ("OCME"), where he logged it in and placed it in a secure refrigerator. Appellant's urine sample was then tested at the OCME toxicology lab. Mr. Lucas Zarwell ("Mr. Zarwell") was the deputy chief toxicologist at OCME, and his responsibilities included managing six members of the lab staff, reviewing all tests that were done, conducting quality control reviews, and producing reports. He estimated that he had conducted over a thousand urine tests and had reviewed thousands of tests as a supervisor. Despite an objection from the

defense, Mr. Zarwell was qualified as an expert in forensic toxicology.[1]

Mr. Zarwell testified that he had reviewed the results of a urine test before trial to make sure that all procedures were followed; and came to a conclusion that was similar to that of the report. Over a hearsay objection from the defense, the trial court allowed Mr. Zarwell to testify that the urine sample belonged to appellant and that it was sealed and in good condition. The trial court stated that it was allowing Mr. Zarwell's testimony not for the truth of the matter asserted, but rather to demonstrate what he had relied on in forming his expert opinion.

Finally, the court allowed Mr. Zarwell to testify that appellant's urine sample "was in the care, custody, and control of [the] lab," and that there were no issues with the confirmation test performed on the sample, because his testimony was being allowed in only to show the basis for Mr. Zarwell's ultimate expert opinion. Here, the defense raised a Confrontation Clause objection because Mr. Zarwell was attempting to testify that there were no issues with the retest although he was not personally involved in the process. Later, the defense clarified that its objection was that Mr. Zarwell was presenting testimonial hearsay evidence, and that the individuals who actually performed the testing were needed to testify to the lack of errors. The trial court also overruled this objection stating that the testimony was not being admitted for the truth of the matter asserted.

Based on his review of the urine test, Mr. Zarwell testified that appellant's urine sample contained PCP and THC. While he

1. At the time of trial, Mr. Zarwell was a "reviewer." Mr. Zarwell did not personally perform any of the testing on the sample, nor did he form an opinion at the time of testing; in fact, he testified that a reviewer cannot

form an opinion, because he only reviews individual tests. Rather, it is the supervisor who forms an opinion. In this case, the supervisor was Mr. Jason Sklarov.

did not personally observe the testing done on appellant's urine, he said that if there had been any accidents in the testing process, the technicians "would have to record a corrective action report which would be found within the case folder." Though he did not see the technicians wearing gloves, Mr. Zarwell testified that they are required to do so. All of Mr. Zarwell's opinions as to the testing of appellant's urine were based on his review of documents prepared by the technicians.

The government then gave Mr. Zarwell a hypothetical set of facts, and asked whether he would consider the hypothetical individual under the influence of drugs. The fact pattern included an individual whose behavior mirrored appellant's condition on the night of his arrest, as well as the fact that the hypothetical individual's urine tested positive for PCP. Mr. Zarwell responded that given those indicators and the positive urine test, his opinion would be that the hypothetical individual was under the influence of PCP. He then clarified, however, that if the hypothetical had not included the drug test result, he could not say that the individual was under the influence of PCP because other drugs can cause similar behaviors.

The trial court had deferred ruling on the defense's Confrontation Clause objection, but ultimately overruled the objection and allowed Mr. Zarwell to testify that appellant's urine sample tested positive for PCP and THC. The trial court reasoned that Mr. Zarwell was testifying to his own expert opinion, based on his review of the raw data produced by machines, which was not testimonial and therefore did not implicate the Confrontation Clause. Additionally, because it was his own expert opinion, the trial court stated that he was the one bearing testimony against the defendant, and thus there was no violation of the Confrontation Clause. With respect to the documents that he reviewed to form his opinion, the trial court stated that they were only being considered as the basis of Mr. Zarwell's testimony, and therefore were not being used for the truth of the matter asserted.

Ultimately, appellant was convicted of DUI. Judge Demeo emphasized that she found appellant guilty of DUI beyond a reasonable doubt "even without [Mr.] Zarwell's testimony."

## II. Appellant's Confrontation Clause Claim

Appellant argues that the trial court admitted Mr. Zarwell's ultimate opinion that his urine sample contained PCP and THC in violation of the Confrontation Clause of the Sixth Amendment which, given this court's decision in *Young*, constitutes error. On this point, we agree with appellant.

■ This court reviews *de novo* whether the admission of certain evidence violates a defendant's constitutional rights under the Confrontation Clause. *Diggs v. United States*, 28 A.3d 585, 593 n. 5 (D.C. 2011), *cert. denied*, —— U.S. ——, 133 S.Ct. 334, 184 L.Ed.2d 198 (2012). The Confrontation Clause of the Sixth Amendment affords a criminal defendant the right to be "confronted with the witnesses against him," U.S. CONST. amend. VI, which means that it prohibits the "admission of testimonial statements of a witness who did not appear at trial unless he was unable to testify, and the defendant ... had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 51, 53, 54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

■ The Supreme Court has stated that for a hearsay statement to be considered "testimonial" in nature, it must be "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact" relevant to investigating or

prosecuting a crime. *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354. For example, statements that are made during the course of police interrogation, "when the circumstances objectively indicate that there is no [ ] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), are considered testimonial statements. This has been referred to as the "evidentiary purpose" test. *See Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 2266, 183 L.Ed.2d 89 (2012) (Kagan, J., dissenting) (citing *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 310–11, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), in which the Court held that certified forensic reports fell within the "core class of testimonial statements ... because they had a clear evidentiary purpose").

Recently, however, the Supreme Court wrestled with what constitutes a testimonial statement in *Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), and the Justices splintered over whether a statement must meet requirements in addition to the evidentiary purpose test in order to be considered "testimonial." In *Young v. United States*, 63 A.3d 1033 (D.C.2013), this court analyzed the Supreme Court's decision in *Williams*, and concluded that though there was no single rationale explaining the Court's decision:

> It is logically coherent and faithful to the Justices' expressed views to understand *Williams* as establishing—at a minimum—a sufficient, if not a necessary criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the plurality's targeted accusation requirement or Justice Thomas' formality criterion.

63 A.3d at 1043–44. In *Young*, this court held that an FBI lab supervisor, who testified to the results of a DNA test in which she had not personally participated, relayed testimonial hearsay in violation of the Confrontation Clause. *Id.* at 1048. Because the court concluded that the use of that testimonial hearsay constituted non-harmless, constitutional error, we reversed Young's conviction and remanded the case for a new trial. *Id.* at 1057–58.

■ Under this court's interpretation of *Williams* in *Young*, the results of appellant's urinalysis clearly constitute testimonial statements. The "evidentiary purpose" prong of the test is satisfied because the preparation of the urinalysis, the point of which was to prove that appellant was under the influence of drugs on the night in question, was a statement made under "circumstances objectively indicat[ing] that [the declarant's] primary purpose [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822, 126 S.Ct. 2266. The urinalysis also meets Justice Alito's "targeted accusation" test; indeed, the only reason for testing appellant's urine was to prove that he had committed the crime of DUI.

■ Additionally, just as in *Young*, the information Mr. Zarwell relayed was hearsay because he was a supervisor at OCME who did not personally perform or observe the testing of appellant's urine sample. Though Mr. Zarwell did not participate in the receipt and control of the sample, he was allowed to testify that it was sealed and that there were no spills or other possible contamination. Like the FBI lab supervisor in *Young*, Mr. Zarwell testified based on his review of the paperwork completed by the lab technicians who actually performed the tests, and thus the information he relayed was testimonial hearsay.

The District urges us to distinguish this case from *Young* on the basis that Young was tried in front of a jury, and the trial court did not provide any limiting instruction explaining that the FBI lab supervisor's statements could be used for the sole, non-hearsay purpose of understanding the bases for her opinion. 63 A.3d at 1046. In this case, on the other hand, appellant was tried in a bench trial, and Judge Demeo specifically stated that she was admitting his testimony not for the truth of the matter asserted, but rather to demonstrate what Mr. Zarwell had relied on in forming his expert opinion.

■ However, as this court recognized in *Young*, at least five Justices would find that admitting testimonial hearsay for the limited, non-hearsay purpose of evaluating the basis of the expert's opinion does not cure the Confrontation Clause violation. In *Williams*, five Justices reasoned that allowing an expert to present testimonial hearsay to explain the grounds for his opinion on the basis that the information is not offered for the truth of the matter asserted "does not work because 'the purportedly limited reason for such testimony—to aid the factfinder in evaluating the expert's opinion—necessarily entails an evaluation of whether the basis is true.'" 63 A.3d at 1047, n. 53 (quoting *Williams*, 132 S.Ct. at 2257 n. 1) (Thomas, J., concurring in judgment). More specifically:

[W]hen a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion ... the statement's utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies ... Admission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do

nothing with it *except* assess its truth and so the credibility of the conclusion it serves to buttress.

*Id.* (quoting *Williams*, 132 S.Ct. at 2268–69) (Kagan, J., dissenting) (emphasis in original) (internal citations omitted).

■ Thus, although Judge Demeo stated that Mr. Zarwell's testimony was admitted solely for the non-hearsay purpose of allowing her to evaluate the basis for his expert opinion, doing so did not cure the Confrontation Clause violation. Under *Williams* and *Young*, Mr. Zarwell's testimony concerning the results of the urine sample constituted testimonial hearsay, and allowing him to so testify violated appellant's Sixth Amendment right to confront all witnesses against him.

Having concluded that appellant's Sixth Amendment right of confrontation was violated, his conviction must be reversed unless the error was harmless beyond a reasonable doubt. *Gardner v. United States*, 999 A.2d 55, 58 (D.C.2010) (citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Under *Chapman*, the correct inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Ellis v. United States*, 941 A.2d 1042, 1049 (D.C.2008) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).

This court has reversed the convictions of appellants in several cases where this type of evidence has been wrongly admitted in violation of the Confrontation Clause. *See, e.g., Duvall v. United States*, 975 A.2d 839 (D.C.2009); *Fields v. United States*, 952 A.2d 859 (D.C.2008); *Callaham v. United States*, 937 A.2d 141 (D.C.2007). In each of these cases, the trial court committed constitutional error under

*Crawford* by admitting a report called a DEA–7, which identifies the particular chemicals in a given substance, without having the chemist who prepared the report testify at trial. *E.g., Fields,* 952 A.2d at 860. However, these cases are easily distinguishable from the instant case. First, the defendants in the foregoing cases were each charged under a statute that required the government to prove possession of a specific type of substance, *Duvall,* 975 A.2d at 843 (possession of a controlled substance); *Fields,* 952 A.2d at 860 (possession of marijuana); *Callaham,* 937 A.2d at 142 (possession of cocaine), such that the information contained in the DEA–7 was necessary for conviction. This means that admitting the DEA–7 reports in violation of the Confrontation Clause was clearly non-harmless error because without those reports, the government would not have been able to convict the defendants.

Additionally, in these cases this court recognized that scientific reports like the DEA–7 have played a prominent role in the prosecution of drug cases, such that "a jury could well have ... a doubt about the governments case if the prosecution did not proffer the type of scientific evidence establishing the identity of the substance that is commonly expected." *Duvall,* 975 A.2d at 846–47 (quoting *Fields,* 952 A.2d at 867). Thus, the court could not say in these three cases that the verdict was "surely unattributable" to the erroneously admitted DEA–7 reports, and reversal of the convictions was required.

 In the present case, on the other hand, appellant is charged under the Dis-

trict's DUI statute. Section 50–2201.05(b)(1)(A)(i)(II) (2007 Supp.) of the D.C.Code states that: "No person shall operate or be in physical control of any vehicle in the District ... [w]hile under the influence of intoxicating liquor or any drug or any combination thereof." Importantly, "[a] person is guilty of [driving under the influence] if he or she is *to the slightest degree* ... less able, either mentally or physically or both, to exercise the clear judgment and steady hand necessary to handle as powerful and dangerous a mechanism as an automobile with safety to himself and the public," *Karamychev v. District of Columbia,* 772 A.2d 806, 812 (D.C.2001) (emphasis in original) (internal quotation marks omitted), and circumstantial evidence is sufficient to prove DUI. *See Harris v. District of Columbia,* 601 A.2d 21, 27 (D.C.1991) (holding that in a DUI case, expert testimony is not necessary to establish a link between drug use and impaired driving).

 While the government needed the results of the DEA–7 reports in *Duvall, Fields,* and *Callaham* to prove the defendants guilty of the crimes charged, in this case the District did not need to prove the particular type of drug that caused appellant's impairment in order to convict him under the DUI statute.[2] Moreover, while the DEA–7 reports were admitted in jury trial cases, in which a jury might have expected or required such evidence to convict, the instant case was a bench trial. Thus, there is no concern that the absence of scientific proof of the type of drug ap-

---

**2.** The DUI statute, § 50–2201.05(b)(1)(A)(i)(II), under which appellant was charged has since been repealed. That statute did not provide a definition for what constitutes a "drug." It is axiomatic that when a statute does not define a term, this court looks to its ordinary meaning. *Mohamad v. Palestinian Auth.,* —— U.S. ——, 132

S.Ct. 1702, 1706–07, 182 L.Ed.2d 720 (2012) (citations omitted). As such, for purposes of this DUI statute, which criminalizes driving under the influence of *any drug*, the District need only put on evidence that the defendant was under the influence of a drug generally, rather than a particular drug, to prove its case.

pellant had ingested would have changed the verdict.

Rather, this case is most similar to *Digsby v. United States,* 981 A.2d 598, 607 (D.C.2009), in which we found that the trial court's constitutional error in admitting the report of a DEA chemist, without the testimony of the chemist, nonetheless constituted harmless error. In that case, Digsby was charged with possession with intent to distribute marijuana and, in addition to the report of the DEA chemist, the government presented evidence that appellant referred to some of the drugs that were seized as "only some weed"; that ziplock bags, like those found in appellant's home, were used to package marijuana; that sixty-four small bags of a green weed-like substance were recovered from appellant's toilet; and that a large sum of cash as well as a scale and other empty ziplock bags were found in appellant's bedroom. Under those circumstances, we concluded that the error was harmless because "the verdict was surely unattributable to the erroneously admitted evidence." *Id.*

■ Here, we conclude that the trial court's error was harmless beyond a reasonable doubt for similar reasons. *Gardner v. United States,* 999 A.2d 55, 58 (D.C. 2010) (citing *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In this case, the arresting officers testified that appellant was "driving very slow with little control," and that when one officer turned on his emergency lights, instead of stopping, appellant "rolled through a stop sign, and turned left into the oncoming traffic lane." Appellant then made a U-turn onto the other side of the road—into oncoming traffic—before "hitting the curb and coming to a stop." When the officers approached his vehicle, appellant looked at them "with a blank stare, and was confused by [their] orders." While they "repeatedly advised him to put the car in park ... based upon his condi-

tion, he was unable to do so." Appellant was confused by the officers' order to exit the vehicle, and could not get out on his own. After he was helped out of the vehicle, appellant fell over, and could not stand up. The officers testified that "[h]e was laughing the whole time, and ... without [their] assistance, he couldn't walk."

After appellant told Officer Rubin that he had no physical limitations that would interfere with testing, appellant failed all of the field sobriety tests administered. He never complained of a medical condition, and Officer Rubin testified that based on his previous training and experience, appellant's behavior indicated intoxication rather than a medical condition. Though there was no odor of alcohol coming from his person or vehicle, his "speech was slurred, his pupils were dilated, and he was having difficulty following directions." Finally, all three police officers who encountered appellant that night testified that given his behavior, it was their opinion that he was under the influence of drugs or alcohol.

Based on this evidence, we are satisfied beyond a reasonable doubt that appellant's conviction for DUI was not based on the results of any drug tests but was instead based on appellant's obviously impaired condition at the time the police stopped his vehicle, as well as his subsequent actions at the police station. As such, the trial court's error was harmless beyond a reasonable doubt, and appellant's conviction for DUI should be affirmed.

### III. Appellant's Evidentiary Claim

■ Appellant's second argument is that the trial court committed reversible error in allowing Mr. Zarwell to answer a hypothetical question that involved an individual testing positive for PCP, when that fact was not in evidence. This argument has no merit.

██ In the District of Columbia, an expert witness may answer hypothetical questions that mirror facts already in evidence. *Bushong v. Park,* 837 A.2d 49, 55 (D.C.2003). This court reviews the admission or denial of expert witness testimony for non-constitutional harmless error, *Smith v. United States,* 27 A.3d 1189, 1196 (D.C.2011), and reversal is required "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

In this case, the trial court did not err in allowing the hypothetical question at the time it was asked because the government had already adduced the evidence of the drug testing and the trial court had taken under advisement the question of whether those results were admissible. Thus, the evidence of PCP in appellant's system was a fact in evidence capable of being used in any hypothetical question posed to the expert. However, even assuming that the trial court erred in allowing that fact to be included in a hypothetical posed to the expert, we are satisfied that the error was harmless for the reasons stated, *supra* at Part II.1.

### IV. Conclusion

For the foregoing reasons, the judgment of the trial court is hereby affirmed.

*So ordered.*