*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CT-784

CECELIA ELLEN MILLS, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CTF-11947-16)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued February 5, 2021                    Decided September 30, 2021)

*Omar M. Bississo* for appellant.

*John D. Martorana*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Rosalyn C. Groce*, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN, *Associate Judge*, THOMPSON, *Associate Judge,*[*] and LONG, *Senior Judge District of Columbia Superior Court.*[**]

---

[*] Judge Thompson was an Associate Judge of the court at the time the case was argued. Although Judge Thompson's term expired on Saturday, September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.) ("Subject to mandatory retirement at age 74 and to the provisions of subchapters II and III of this chapter, a judge of a District of Columbia court appointed on or after the date of enactment of the District of Columbia Court Reorganization Act of 1970 shall serve for a term

(continued…)

THOMPSON, *Associate Judge*:  After a bench trial before a magistrate judge (the Honorable Rainey Brandt), appellant Cecelia Mills was found guilty of reckless driving (*see* D.C. Code § 50-2201.04(b) (2021 Supp.)) and driving under the influence of alcohol or drugs (DUI) (*see* D.C. Code § 50-2206.11 (2020 Repl.)).  Thereafter, Associate Judge Heidi Pasichow denied appellant's motion for review.  In this appeal, appellant renews her argument that the evidence was insufficient to support the convictions.  She also contends that the trial court abused its discretion in failing to impose sanctions on the District of Columbia (the "government") for its failure to preserve body-worn camera (BWC) footage recorded when appellant was at Providence Hospital hours after her arrest.  For the reasons that follow, we affirm the judgment of the Superior Court.

### I.      Factual & Procedural Background

---

(…continued)
of fifteen years, and upon completion of such term, such judge shall continue to serve until the judge's successor is appointed and qualifies.").

** Sitting by designation pursuant to D.C. Code § 11-707(a) (2001).

Metropolitan Police Department (MPD) Officers Jonathan Earhart and Alex Berg were the sole witnesses at appellant's trial. In his testimony pertinent to the reckless driving charge, Officer Earhart told the court that the officers encountered appellant's vehicle at about 9:44 p.m. on July 27, 2016, when, as part of their patrol, they were driving southbound on Holbrook Street, N.E. Officer Earhart described Holbrook Street, a street with no lane-dividing lines, as "a little narrow" in some spots.[1] On the night in question, it had vehicles parked on both sides, and traffic was "very light." Officer Earhart described the vehicle appellant was driving as a "very, very old Cadillac[,]" "a little bit larger vehicle." He testified that he observed appellant, driving at a "relatively higher rate of speed," make a wide turn onto Holbrook Street to go northbound – "basically like a veering motion to come around the parked vehicles that were on the side." The turn caused appellant's vehicle to veer into the police cruiser's lane of traffic; Officer Earhart "felt like [appellant's] vehicle was going to impact [the officers'] vehicle[,]" which caused the officers to "ha[ve] to stop and swerve to the right to avoid being struck by [appellant's] vehicle." Officer Earhart also noticed that appellant's vehicle had only one operable headlight. The officers turned around and then followed

---

[1] Officer Earhart explained that "when there is another vehicle coming in the opposite direction [on Holbrook Street], . . . it can definitely get fairly tight."

appellant as she made a series of right turns without signaling. After appellant's vehicle arrived at Holbrook Street again,[2] it made a left turn onto Holbrook and abruptly pulled "head-first" into a parallel-parking spot, coming so close to the car parked behind her that the officers felt compelled to check for damage (although no damage was found).[3]

Officer Berg gave similar testimony. He described Holbrook Street as a "narrow street" where "[t]here was room for two cars to pass, but it required both cars to be . . . as far over as possible to the side of the road." Officer Berg did not "recall seeing any other vehicles on the road or driving" at the time. He also did not recall how far behind appellant's vehicle the police cruiser was at the times when appellant failed to give turn signals. Both officers described appellant's driving as "erratic."

Both officers also gave testimony about appellant's demeanor after she had parked. Their testimony was consistent: appellant exited her vehicle despite the officers' requests that she remain inside; "h[ung] onto the vehicle" while walking

---

[2] Through her series of turns, appellant essentially "turn[ed] around to go southbound" on Holbrook Street.

[3] It appeared to Officer Earhart that appellant "was trying to park as close to her house as possible."

to the rear of her car; was slow to respond to, and did not appear to understand the officers' questions; made incoherent statements and gave non-responsive or non-sensical answers; when asked for her driver's license, "just kind of star[ed] off in the distance[,]" "blankly"; provided only five digits of her Social Security number and then stared "blankly ahead and didn't answer anything further after that"; rather than provide her license and registration, handed the officers mail and court documents; had "slurred" and difficult-to-understand speech; had red, glossy, and bloodshot eyes; repeatedly insisted that she needed to urinate; and had problems keeping her balance and needed assistance with walking so that she would not fall over. Defense counsel asked Officer Earhart whether appellant's mode of answering was just an uncooperative reaction to her recognizing the officer from a prior incident (that had resulted in a court order prohibiting appellant from driving). Officer Earhart discounted that idea, explaining, "I don't know if I would construe it as not cooperative. . . . [S]he just wasn't . . . answering half the time and her statements at times did not make any sense." Appellant did not request medical assistance or say that she had medical problems or needed a cane.

The officers testified that they made multiple calls to dispatch to request a Standardized Field Sobriety Test officer to conduct a sobriety test, but were told that none were available at the time. Based on their experience in interacting with

impaired individuals (both estimated multiple such interactions per week), the officers believed that appellant was intoxicated or "under the influence of alcohol or drugs of some substance." The officers placed appellant under arrest and transported her to the police station. The government did not present evidence about what transpired at the station (and thus offered no evidence about any substance testing protocol or response) because the intake portion of the station house video footage was missing.[4]

Not quite three hours after her arrest, appellant (who the record indicates was 68 years old at the time and was complaining of breathing problems and asthma symptoms) was taken to Providence Hospital for evaluation. There, MPD Officer Duane Moore, who was on detail at the hospital, activated his body-worn camera at 12:53 a.m. on July 28, 2016, during six minutes and seven seconds of appellant's hospital visit. Before trial, in response to the defense's request for this body camera footage, the prosecutor reported that the footage, which had been

---

[4] The prosecutor proffered that appellant "is seen walking around [the station] in the [portion of the] video [that the defense was able to view]." The trial court recognized that the portions of the video that were not lost "may have been of some relevance" regarding the officers' testimony about appellant's "being unsteady on her feet" if it showed appellant walking or standing, and said that defense counsel could play that portion "if [counsel] want[ed] [the court] to see something." The defense did not introduce that portion of the station house video and also presented no other evidence.

labeled "incident" and "no arrest[,]" had been deleted in November 2017 as it was not tagged to be saved. The trial court noted that Officer Moore had not "encountered [appellant] at the station house and found there was "really no reason to believe that [Officer Moore] was part of the investigative team . . . investigating towards a prosecution." During a colloquy before the close of the government's case, the court denied defense counsel's request that the court infer that the missing video footage would have been favorable to appellant.

Appellant moved for a judgment of acquittal at the close of the government's case and, after the motion was denied, argued again in closing that the evidence was insufficient for conviction on either charge  Finding that the officers' testimony was credible, the trial court found that appellant's driving was "not cautious and prudent" under the circumstances, noting in particular the wide turn and veering into the officers' lane of traffic, the lack of signaling with the police cruiser on the road, the inoperable headlight, and "the higher rate of speed than normal." The court also found that appellant's behaviors observed by the officers, who the court emphasized frequently encounter people under the influence, were not those of someone being uncooperative but rather of someone being under the influence. The court cited in particular appellant's difficulty

balancing, failure to follow directions, and bloodshot and glassy eyes. The court therefore found appellant guilty of both charges.

The reviewing judge agreed that the evidence was sufficient to prove reckless driving and DUI and also concluded that the trial court did not abuse its discretion in declining to impose a discovery sanction. This appeal followed. Although our review is of the associate judge's order affirming the magistrate judge's rulings, "our powers of appellate review are [not] so limited that . . . we may not look to the findings and conclusions of the fact finder on which that ruling is based." *In re C.A.B.*, 4 A.3d 890, 902 (D.C. 2010).

## II. Sufficiency of the Evidence

### A. Standard of Review

Our review of a claim of insufficiency of the evidence is de novo, but we must "view[] the evidence in the light most favorable to the prosecution, and affirm[] a conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Thomas v. United States*, 249 A.3d 802, 804 (D.C. 2021) (internal quotation marks omitted) (quoting *Powell v. United States*, 238 A.3d 954, 957 (D.C. 2020)). Stated differently, "[o]ur standard

of review of the sufficiency of the evidence is limited to determining whether as a matter of law, . . . no reasonable fact finder acting reasonably[] could convict appellant on the evidence presented." *Kennedy v. District of Columbia*, 601 A.2d 2, 2 n.2 (D.C. 1991) (brackets and internal quotation marks omitted) (quoting *Beatty v. United States,* 544 A.2d 699, 701 (D.C. 1988). "In considering the sufficiency of the evidence, we make no distinction between direct and circumstantial evidence," recognizing that "circumstantial evidence is not intrinsically inferior to direct evidence." *Smith v. United States*, 809 A.2d 1216, 1222 (D.C. 2002) (internal quotation marks omitted) (quoting *Bernard v. United States,* 575 A.2d 1191, 1193 (D.C. 1990). "The standard for overturning convictions for evidentiary insufficiency is a demanding one," and thus an appellant bringing an insufficiency claim faces a difficult burden. *Sheffield v. United States*, 111 A.3d 611, 625 (D.C. 2015).

## B. Reckless Driving

D.C. Code § 50-2201.04 (entitled "Speeding and reckless driving") provides that a person is guilty of reckless driving if she drives a vehicle "carelessly and heedlessly in willful or wanton disregard for the rights or safety of others, or without due caution and circumspection and at a speed or in a manner so as to

endanger or be likely to endanger a person or property." D.C. Code § 50-2201.04(b); *see also Pelote v. District of Columbia*, 21 A.3d 599, 605-06 (D.C. 2011) (interpreting § 50-2201.04(b) as having two basic elements: one mental, "heedlessly in willful or wanton disregard" or "without due caution and circumspection"; the other action, "at a speed or in a manner so as to endanger . . . person or property").[5]

## C. Driving Under the Influence

---

[5] Section 50-2201.04 was previously codified as D.C. Code § 40-605(b) (1961) and D.C. Code § 40-712(b) (1981). Its language was enacted in 1931, *see* Pub. L. No. 71-742, § 4, 46 Stat. 1424, 1427 (1931), with a title ("Speeding and Reckless Driving") that remains as the current title and that appears to be a carryover from the title of a predecessor statute enacted in 1925. *See* Pub. L. No. 68-561, § 9, 43 Stat. 1119, 1123 (1925). The title was a misnomer, as the 1925 statutory language plainly covered more than driving recklessly and speeding. It read:

> No individual shall operate a motor vehicle over any public highway in the District (1) recklessly; or (2) at a rate of speed greater than is reasonable and proper, having regard to the width of the public highway, the use thereof, and the traffic thereon; or (3) so as to endanger any property or individual; or (4) so as unnecessarily or unreasonably to damage the public highway.

*Id.* As we discuss *infra*, § 50-2201.04 likewise covers more than reckless (or heedless) driving and speeding.

D.C. Code § 50-2206.11(2) provides that "[n]o person shall operate or be in physical control of any vehicle in the District . . . [w]hile the person is under the influence of alcohol or any drug or any combination thereof."  D.C. Code § 50-2206.11.  A person is "under the influence" if she is "appreciably" — meaning in a manner "capable of being perceived by the naked senses" — "less able, either mentally or physically or both, to exercise the clear judgment and steady hand necessary to handle . . . [an] automobile with safety to h[er]self and the public." *Taylor v. District of Columbia*, 49 A.3d 1259, 1267 (D.C. 2012).  "[C]ircumstantial evidence [of impairment by drugs and/or alcohol] will suffice even though it does not [identify the substance or] specifically quantify the amount of the substance ingested and relate it to the ability to drive."  *Harris v. District of Columbia*, 601 A.2d 21, 25, 26 (D.C. 1991) (noting that "all three of the testifying police officers had experience dealing with individuals under the influence of drugs and each officer pointed to specific observations that led him or her to believe Harris was under the influence of *some substance*" (emphasis added)); *see also Carrington v. District of Columbia*, 77 A.3d 999, 1006 (D.C. 2013) (explaining that the government needed only to put on evidence that the defendant was under the influence of a drug generally, rather than a "particular type of drug," to prove its case).

### III.    Analysis[6]

### A.    Reckless Driving

In finding appellant guilty of violating § 50-2201.04(b), the trial court reasoned that appellant drove "without the degree of caution that a reasonable or prudent driver would exercise under similar circumstances," noting that she caused the officers' vehicle to have "to stop abruptly to avoid being hit."  The trial court's language primarily tracks the statutory references to "due caution" and endangerment, and we therefore infer and conclude that the court relied on the second portion of § 50-2201.04(b) ("without due caution or circumspection and at a speed or in a manner so as to endanger or be likely to endanger a person or property") (hereafter, the "without due caution" clause) rather than on the first portion ("carelessly and heedlessly in willful or wanton disregard for the rights or safety of others") (hereafter, the "heedless and willful or wanton disregard" clause).  *See Pelote*, 21 A.3d at 605-06 (distinguishing the two clauses).

At least one of this court's cases implies that proof that the defendant acted heedlessly is a *sine qua non* of a reckless driving charge.  *See Swailes v. District of*

---

[6] We note parenthtically that, in lieu of a brief, the District filed a motion for summary affirmance, which was denied by a motions panel of this court, which determined that a thorough analysis of the statutory language would be important to the disposition.  In the text that follows, we undertake that analysis.

*Columbia*, 219 A.2d 100, 102 (D.C. 1966) (stating that "[t]o sustain the charge of reckless driving, the government must show that appellant operated his automobile in a careless manner, with heedless disregard of the consequences" (applying D.C. Code § 40-605(b) (1961)).[7] If the quotation from *Swailes* were a correct statement of the law, we would agree with appellant that the evidence was insufficient for conviction under § 50-2201.04(b). Per BLACK'S LAW DICTIONARY (4th ed. 1951), "heedlessly" "includes the element of disregard of the rights of others." "'[W]illful' and 'wanton' have substantially the same meaning" and "[w]illfulness . . . require[s] a conscious indifference to consequences under circumstances likely to cause harm." *Bohannon v. District of Columbia Dep't of Motor Vehicles*, 288 A.2d 672, 675 (D.C. 1972). We have no troubling concluding that the evidence in this case did not satisfy that standard.

Appellant made a wide turn and veered into the officers' lane of traffic, but then swerved to correct her position in order (a reasonable factfinder could infer) to avoid harmful consequences. Moreover, Officer Earhart testified that appellant made the wide turn "to come around" — i.e., to avoid hitting — parked vehicles.

---

[7] *But see Kennedy*, 601 A.2d at 2 ("To find appellant guilty of reckless driving, the finder of fact need only determine that he drove without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger any person or property." (quoting D.C. Code § 40-712(b) (1981) (internal quotation marks omitted))).

Further, while appellant was driving at night with only one headlight, there was no evidence that she knew the light was not working. Although appellant repeatedly failed to signal when she made a series of turns, there was no evidence about how close the officers' vehicle was to hers, precluding an inference that she was indifferent to whether they could perceive her slowing to turn in time to avoid a collision. And although the officers thought appellant might have hit another parked vehicle when she made her nose-first parking maneuver, there was no evidence about how large the parking space was and thus about whether she could perceive that such a maneuver might work without adverse consequences. In short, the evidence does not permit a conclusion that appellant acted heedlessly or wantonly.

It seems fair to say, however, that in *Swailes*, "the judicial mind was not focused on the issue we now confront." *Tann v. United States*, 127 A.3d 400, 440 n. 22 (D.C. 2015).[8] Therefore, the statement in *Swailes* appearing to require

---

[8] The *Swailes* court was concerned with a double jeopardy claim. 219 A.2d at 101. A jury had found Swailes not guilty of reckless driving and DUI, but the trial court, in a bench trial, found him guilty of unreasonable speed and changing lanes without caution. *Id.* at 101, 103. In making the statement quoted above, the *Swailes* court was roughly describing the (generic) elements of reckless driving to make the point that "unreasonable speed and changing lanes without caution are not essential elements of reckless driving[,]" which may be proven with different rather than "the same evidence." *Id.* at 102. The opinion in *Swailes* does not

(continued…)

proof that a defendant acted "heedlessly" to be convicted of reckless driving is "not binding on this court with regard to th[e] question of statutory construction" we now confront. *Corbin v. United States*, 120 A.3d 588, 597 (D.C. 2015). In contrast to the statement in *Swailes*, when this court focused on the two clauses of § 50-2201.04(b) that are separated by a comma and the word "or," we found no error in the trial court's instructing the jury that the reckless driving statute comprises "two different offenses" ("to drive carelessly and heedlessly in willful and wanton disregard of the rights and safety of others" and to "operate a vehicle without due caution and circumspection, and at a speed and in a manner so as to endanger or be likely to endanger persons or property") and specifically held that the trial court did not err in "withdraw[ing] from the jury's consideration the inapplicable portions of the court's previous overinclusive instruction concerning the definition of reckless driving" since the government had charged only a violation of the "without due caution" clause. *Murray v. District of Columbia*, 358 A.2d 651, 653 (D.C. 1976); *see also Pelote*, 21 A.3d at 605-06 (referring to the statute's two basic mental elements separated by the word "or").

---

(…continued)
describe what evidence the jury considered in acquitting Swailes of reckless driving.

In sum, the language and structure of § 50-2201.04(b) indicate that there are alternative ways of committing the offense known as "reckless driving," only one of which requires reckless or "heedless" driving.[9]  By its plain language, § 50-2201.04(b) establishes that driving either "carelessly and heedlessly in willful or wanton disregard for the rights or safety of others" or "without due caution or circumspection and at a speed or in a manner so as to endanger or be likely to endanger a person or property" constitutes reckless driving.[10]  The question in this case is whether appellant's guilt of the latter was proven on this record.

---

[9] This is notwithstanding the fact that the title of § 50-2201.04 is "Speeding and *reckless* driving" (italics added).  See *supra* note 5.  We have recognized that the title of a statute may be "of use" in statutory interpretation if it "sheds light on some ambiguous word or phrase in the statute itself[,]" but have also emphasized that the title "cannot limit the plain meaning of the [statutory] text[.]"  *Mitchell v. United States*, 64 A.3d 154, 156 (D.C. 2013) (internal quotation marks and brackets omitted) (first quoting *Carter v. United States*, 530 U.S. 255, 267 (2000); then quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998).

Focusing on the language of § 50-2201.04(b), we note that "carelessly *and* heedlessly" are adverbs that modify "drives," but that "without due caution" and the other prepositional phrases that follow it likewise function as adverbs modifying "drives."  Thus, there is no need to read § 50-2201.04(b) as if "carelessly *and* heedlessly" apply to all of the subsequent language.  As a matter of syntax, the adverb prepositional phrases that introduce the "without due caution" clause make sense and can stand on their own without the "carelessly and heedlessly" phrase.

[10] We note that this is the interpretation applied by courts in other jurisdictions that have (or had) reckless driving or felonious driving statutes containing language identical or nearly identical to the language in our statute. *See, e.g.*, *State v. Rossman*, 268 N.W. 702, 703 (S.D. 1936) ("The language of the

(continued…)

As described above, the evidence showed that Holbrook Street is a narrow thoroughfare, that it had vehicles parked on both sides on the night in question, and that appellant was driving a "larger" vehicle when she turned onto the street. The trial court as factfinder could infer that due caution and circumspection required appellant, when executing her entry onto Holbrook Street, to take into account and make adjustments for all those factors. Instead, she made her turn in a manner that brought her car into the path of the police cruiser. Having made the turn, she continued driving at "a relatively higher rate of speed[,]"[11] causing the officers to pull over to the right as far as they could without side-swiping parked cars, and to brake and brace for a head-on collision.[12] We conclude that these facts were

---

(…continued)

statute is in the alternative[.]"); *see also, e.g.*, *Zann v. State*, 17 So. 3d 1222, 1224 (Ala. Crim. App. 2009); *People v. Marshall*, 255 N.W.2d 351, 353 (Mich. Ct. App. 1977); *State v. Kreiger*, 138 N.W.2d 597, 600 (N.D. 1965).

[11] The trial court either recollected incorrectly that the officers testified that appellant drove at a "higher rate of speed than normal[,]" or so interpreted Officer Earhart's testimony about appellant's "relatively higher rate of speed." In either case, we discern no prejudice to appellant.

[12] We note the following testimony by Officer Earhart:

> Officer Earhart: [C]ertainly it is a lot tougher for a
> vehicle that size and pretty much any other vehicle
> particularly like [the police cruiser] to be able to pass

(continued…)

sufficient to prove that appellant drove "without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger a person or property."[13]  One reason why we find the evidence to be sufficient as a matter of law is that the near-miss of a collision with the police car occurred in appellant's own neighborhood.  Thus, she was in a position to know already that Holbrook Street is narrow, that it had no lane markings, and that two cars proceeding in opposite directions could do so safely only by staying as far to the right as possible

_____

(…continued)

> safely without having to really slow down and use caution when passing each other.
>
> Prosecutor:  In that particular instance when she passed you did it appear that she used caution?
>
> Officer Earhart: At first, no, because she had come at us, you know she was coming toward us at a relatively higher rate of speed and came into our line of travel and then turned back to the right to avoid striking us. At the same time . . . we had pulled to the right as best as we could considering there were other parked vehicles along our side of the road as well.

[13] Thus we agree with Judge Pasichow that "[c]ontextual factors such as the darkness at that hour, the residential neighborhood, the narrowness of the street, and the parked cars on either side of the road contribute[d] to the totality of circumstances which would lead a reasonable fact finder to conclude that the [d]efendant was driving 'without due caution and circumspection and at a speed or in a manner so as to endanger or be likely to endanger a person or property.'"

while passing each other. Appellant's manner of driving, particularly as this happened at night, reflected no caution to compensate for these realities.

To be sure, most of our reported cases affirming reckless driving convictions have involved more extreme conduct.[14] We cannot say, however, that "no reasonable fact finder acting reasonably, could convict appellant on the evidence presented" here. *Kennedy*, 601 A.2d at 2 n.2 (brackets omitted) (quoting *Beatty*, 544 A.2d at 701); *cf. United States v. Bookhardt*, 277 F.3d 558, 567 (D.C. Cir. 2002) (holding that police had probable cause to arrest Bookhardt for reckless driving where he drove at a high rate of speed, wove in and out of lanes without signaling, forced police cruiser off the road, and nearly caused a collision); *United States v. Jackson*, 167 F. App'x 812, 813 (D.C. Cir. 2005) (same where officers testified to having observed the defendant "fail to stop at a stop sign, fail to signal

---

[14] *See, e.g., Ball v. United States*, 26 A.3d 764 (D.C. 2011) (involving reckless driving charge based on high speed chase that ended after tire blow out); *Kennedy*, 601 A.2d at 2 (affirming reckless driving conviction based on testimony that appellant raced his car on the street, ran a stop sign, exceeded the speed limit, and failed to stop for police, and that other cars and pedestrians were in the street during the incident); *United States v. Covington*, 459 A.2d 1067, 1069 (D.C. 1983) (remanding to reinstate jury verdict finding appellant guilty of a possession charge, which had been vacated, and reckless driving where testimony established that appellant drove with man hanging on the exterior of his vehicle and then led police on a high speed chase, ran stop signs and red lights, exceeded forty miles per hour in a school zone, traveled the wrong way on one way streets, and stopped only after colliding with a fire hydrant).

when turning and swerve to avoid oncoming traffic in an alley"). Accordingly, we affirm appellant's reckless driving conviction.

## B. DUI

Appellant argues that the evidence was insufficient to support her DUI conviction because the government presented no evidence with a "direct nexus" to substance abuse, such as a field sobriety test or horizontal gaze nystagmus test, chemical breath or blood test, testimony about officers having smelled the odor of alcohol, or physical evidence of a substance within the car. We are not persuaded by appellant's argument.

Our case law establishes that "[a] conviction for driving under the influence . . . can be supported by 'an accumulation of evidence'" other than such "direct nexus" evidence, such as "evidence of erratic driving by the accused [or] slurred speech," and "bloodshot and watery eyes, and leaning on the car for support[.]" *Harris*, 601 A.2d at 26-27 (first quoting *Washington v. District of Columbia*, 538 A.2d 1151, 1156 (D.C.1988); then citing *Stevenson v. District of Columbia*, 562 A.2d 622, 624 (D.C. 1989); *see also Koonce v. District of Columbia*, 111 A.3d 1009, 1017 (D.C. 2015) (noting that it is customary in DUI cases for the

government to present the testimony of officers about their observations of the defendant's appearance, speech and actions as a basis from which to infer impairment). The "Redbook" correctly instructs that the smell of alcohol on a defendant driver's person or the presence of alcohol or drugs in the defendant's vehicle is "relevant" evidence of DUI, but such evidence is not so strong as to be conclusive. *See* Criminal Jury Instructions for the District of Columbia, No. 6.400 (5th ed. rev. 2009) ("Evidence that the defendant recently consumed alcoholic beverages is relevant to [a] charge [of DUI], but does not in and of itself prove that [the defendant] was under the influence of or driving while impaired by alcohol."). We have recognized that where a foundation has been laid for lay opinion testimony by a police officer who "has had a reasonable amount of experience observing people who were under the influence" and who personally observed the defendant driver, the officer "is in a better position than the finder of fact to draw inferences and conclusions as to whether the driver was under the influence[.]" *Harris*, 601 A.2d at 24 (noting that the trial court "must also satisfy itself that the officer has an adequate factual basis for an opinion regarding the condition of the particular defendant").

Here, as the trial court noted, both officers testified about their frequent encounters with people who are under the influence of drugs and or alcohol, gave

examples of their "common or general observations" about such people (including their inability to walk, being off balance, glossy and bloodshot eyes, and trouble answering questions). Moreover, it was enough that to the experienced officers' perception and based on their observations, appellant exhibited all those indicia and seemed appreciably impaired. *See Taylor*, 49 A.3d at 1267. Appellant also drove erratically. Evidence such as the testimony about her ability to execute a series of turns to arrive at a parking place in front of her house, see *supra* note 3, perhaps showing that she was not intoxicated, did not fatally undermine the evidence of her impairment.

In closing argument, defense counsel suggested (and appellant's appeal brief likewise suggests) a variety of alternative explanations for what the officers observed about her behavior. Counsel asserted, for example, that what she exhibited was a lack of cooperation grounded in her being upset that Officer Earhart, who had arrested her on an earlier occasion, was stopping her again; and that her age and medical conditions could have accounted for her bloodshot eyes and affected her ability to stand and walk without assistance. However, "the government [was] not required to negate every possible inference of innocence" for the trial court to find guilt beyond a reasonable doubt. *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (internal quotation marks omitted).

For all the foregoing reasons, and viewing the evidence in the light most favorable to sustaining the conviction, we are satisfied that the court heard sufficient evidence to support a guilty verdict on the DUI charge.

## IV.    Failure to Impose Sanctions

Finally, we consider appellant's argument that the trial court abused its discretion by refusing to impose sanctions on the government for failing to preserve Officer Moore's BWC footage recorded at the hospital on the night of appellant's arrest.  Our review is for abuse of discretion.  *Weems v. United States*, 191 A.3d 296, 300 (D.C. 2018).[15]

As briefly described above, the trial court declined to impose sanctions on the government for the loss of Officer Moore's BWC footage because Officer Moore was not involved in the investigation; the footage was recorded hours after the arrest; nothing indicated that the BWC footage audio would have captured

---

[15] The District does not dispute that the failure to preserve the BWC footage was a violation of Super. Ct. Crim. Rule 16, which requires the government to produce documents or other tangible objects material to the defense and "entails an antecedent duty to preserve material that the government has obtained and knows or should know is discoverable." *Weems*, 191 A.3d at 300-01.

appellant's speech unless the officer was in the examination room with her, which was not shown to be likely; and the trial prosecutor had done her "due diligence" to locate the footage and disclosed to defense counsel that it had been deleted (a deletion that the court found was not done in bad faith). In upholding the trial court's ruling, Judge Pasichow cited in particular the low probability of prejudice to the defense in light of when the footage was recorded (nearly three hours after the officers stopped appellant) and the ample evidence of appellant's guilt.

When a trial court determines that the government has violated Rule 16 by failing to preserve discoverable evidence, the court has discretion to "select from [an] extremely broad range of sanctions for corrective action that is just under the circumstances." *Howard v. United States*, 241 A.3d 554, 560 (D.C. 2020) (internal quotation marks omitted) (quoting *Tann*, 127 A.3d at 489). However, the decision whether to impose sanctions is "committed to the discretion of the trial court." *Gethers v. United States*, 684 A.2d 1266, 1272 (D.C. 1996); *see Freeman v. District of Columbia*, 60 A.3d 1131, 1148 n.48 (D.C. 2012). In determining what sanction, if any, should be imposed for a discovery violation, the relevant factors are "(1) the degree of negligence or bad faith involved, (2) the importance of the evidence lost, and (3) the evidence of guilt adduced at trial[.]" *Cotton v. United States*, 388 A.2d 865, 869 (D.C. 1978). "The deliberate destruction of evidence to

hinder the defense generally merits severe sanction, and gross negligence leading to the loss of evidence usually calls for meaningful sanction as well." *Weems*, 191 A.3d at 306. However, "a merely negligent or good faith failure to preserve discoverable evidence does not automatically require a trial court to impose a penalty." *Id.* "[A] trial court has considerable discretion in determining the degree of negligence or bad faith involved in the failure to preserve evidence[,]" and we will disturb the trial court's findings on these matters only if the findings "are plainly wrong or without facts to support them." *Koonce*, 111 A.3d at 1014 (brackets and internal quotation marks omitted) (first quoting *Tyer v. United States*, 912 A.2d 1150, 1165 (2006); then quoting *Davis v. United States*, 641 A.2d 484, 494 (D.C. 1994).

In this case, the reviewing judge explicitly considered the relevant factors, and we discern no abuse of discretion in how the court evaluated them. First, we are satisfied that the deletion of the footage, while deliberate and negligent, did not rise to the level of gross negligence since the video evidence was not the only way of proving any medical impairment that might have underlay appellant's

behavior,[16] and since nothing in the record suggests that a need to preserve the video would have been obvious to the hospital "sentinel" officer. *Compare Weems*, 191 A.3d at 307 (concluding that the police's return of stolen watches to the store before they could be inspected to see if they could all fit in defendant's pocket was negligent at best, even though deliberate, and since the defense could have "obtain[ed] the same model watches to use in the proposed demonstration"), with *Smith v. United States*, 169 A.3d 887, 892, 894 (D.C. 2017) (finding gross negligence in the failure to preserve a pair of shorts in which drugs were found since it was obvious that "unless the government could prove that the shorts . . . belonged to Smith, there could be no conviction" and since there was a failure by "not just one, but two, responsible government departments to assure the required preservation").

In the absence of bad faith by the government, we "will not reverse the trial court's decision as to what sanctions, if any, to impose . . . unless there is an error which has substantially prejudiced a defendant's rights." *Tann*, 127 A.3d at 489 (quoting *Allen v. United States*, 649 A.2d 548, 553 (D.C. 1994)). Thus, we "must determine the likelihood that the verdict would have been different had the

---

[16] For example, defense counsel might have interviewed the hospital "sentinel" officer or hospital staff about any recollection they might have had about appellant's demeanor at the hospital.

government complied with the discovery rules," *Ferguson v. United States*, 866 A.2d 54, 65 (D.C. 2005) (quoting *United States v. Mendoza*, 244 F.3d 1037, 1047 (9th Cir. 2001)), by examining the final two *Cotton* factors: the importance of the evidence lost, and the evidence of guilt adduced at trial, *see Cotton*, 388 A.2d at 869. With regards to the first factor, the BWC footage in this case was not the only evidence linking appellant to the DUI, and its evidentiary value was "speculative at best." *Weems*, 191 A.3d at 307 (internal quotation marks omitted). While appellant argues that video evidence of her behavior could have been beneficial to her case if she was shown continuing to exhibit some of the behaviors the officers observed during her arrest hours earlier, her trial counsel made no proffer that this would be so. We note, moreover, that the defense declined the opportunity to introduce the portions of the station house video that (according to the government's proffer) showed appellant walking around the station sometime after the officers first encountered her.

As to the second factor, there was substantial evidence of appellant's guilt, much of which — for example, appellant's erratic driving, her handing the officers random documents and mail matter rather than her license and registration, and her bloodshot eyes — would not likely have been undermined by anything that might have been captured or would have been observable on the six-minute hospital

video.  Considering all the foregoing, we conclude that the trial court did not abuse its discretion in declining to impose a discovery sanction on the government for failing to preserve the BWC footage.

## V.    Conclusion

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed.*